### Commonwealth *vs.* Vincent Rivera.

Middlesex. May 6, 2005. - September 7, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Eavesdropping. Evidence,* Sound recording, Videotape. *Statute,* Construction. *Practice, Criminal,* Assistance of counsel, Capital case, Duplicative convictions, Lesser included offense. *Constitutional Law,* Assistance of counsel. *Homicide. Felony-Murder Rule.*

At a criminal trial arising from the murder of a convenience store clerk, the judge properly denied the defendant's motion to suppress the audio portion of a videotape recording of the killing, made by a surveillance camera in the store, and to suppress all evidence obtained by police as a result of their use of the recording, where the actions of the police in using the videotape to identify the defendant and then to elicit a confession from him were not unlawful under the Massachusetts wiretap statute, G. L. c. 272, § 99, in that the police had no part in making, inducing, soliciting, or otherwise encouraging or abetting the making of the videotape; where it would be contrary to legislative intent to allow a defendant to bar the police from using such evidence of a murder; and where the Legislature has declined to exercise its authority to overturn the court's interpretation of the statute as expressed in *Commonwealth* v. *Santoro,* 406 Mass. 421 (1990). [122-128] Cowin, J., concurring in part. Cordy, J., concurring, with whom Greaney and Ireland, JJ., joined.

At a criminal trial, there was no ground under the Federal wiretap statute, 18 U.S.C. §§ 2510 et seq. (2000), on which to suppress the audio portion of videotape evidence recorded by a surveillance camera at a convenience store, where any expectation of privacy the criminal defendant claimed in his statements objectively was unreasonable in the circumstances. [128-129]

This court could discern no reason to reduce the verdict of a felony-murder trial or to order a new trial pursuant to G. L. c. 278, § 33E. [129-131]

This court vacated a criminal defendant's conviction of armed assault with intent to rob as duplicative of his conviction of felony-murder. [131-132]

Indictments found and returned in the Superior Court Department on November 8, 2000.

The cases were tried before *Charles M. Grabau,* J., and a motion for a new trial, filed on May 20, 2002, was heard by him.

*Ruth Greenberg* for the defendant.

*Loretta M. Lillios*, Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. A Superior Court jury convicted the defendant of murder in the first degree on a theory of felony-murder. The predicate felony was the defendant's attempted commission of armed robbery while masked. See G. L. c. 265, § 17. He also was convicted of armed assault with intent to rob and unlawful possession of a firearm. The defendant appeals from these convictions and from the denial of his motion for a new trial.

The murder took place during an attempted armed robbery of a convenience store clerk[1] and was recorded, with both audio and video components, by three surveillance cameras. The victim, shot in the head, was the nineteen year old brother of the store's owner. He had arrived only recently in the United States. The police used the audio surveillance recording in their investigation to help them identify the defendant. The recordings (video and audio) were introduced in evidence and played at the trial.

In his motion for a new trial and now on this consolidated appeal, the defendant claims that the store's owner violated the Massachusetts wiretap statute, G. L. c. 272, § 99, and its Federal counterpart, 18 U.S.C. §§ 2510 et seq. (2000), by making a "secret" interception of an "oral communication," G. L. c. 272, § 99 B 2 and C 1, that the police violated those same statutes by using the audio recording in the course of their investigation and to obtain an admission from the defendant, and that the recordings and all evidence obtained as a result of their use should have been suppressed. In addition, he asserts that trial counsel's arguments as to the suppression issue were ineffective. Finally, the defendant requests that we exercise our power under

---

[1] The defendant was indicted on murder in the first degree, G. L. c. 265, § 1; armed robbery while masked, G. L. c. 265, § 17; and unlawful possession of a firearm, G. L. c. 269, § 10 (*a*). The judge instructed the jury on the murder and firearms indictments. The judge allowed a motion for a required finding on so much of the armed robbery while masked count as alleged a *successful* robbery. He instructed the jury on the lesser included offense of armed assault with intent to rob. The judge separately instructed the jury on the predicate felony for murder in the first degree charge, which was attempted armed robbery while masked.

G. L. c. 278, § 33E, to reduce the murder verdict. We affirm the defendant's convictions of murder and unlawful possession of a firearm. We vacate his conviction of armed assault with intent to rob. We decline to exercise our power to reduce the murder verdict pursuant to G. L. c. 278, § 33E.

1. *Background.* The jury could have found the following. In the early morning hours of Sunday, October 22, 2000 (between 3 and 4 A.M.), two individuals wearing gloves and full face masks modeled on those depicted in the movie "Scream" entered a convenience store in Lowell. In street slang, they shouted at the victim, who was working alone, to open the cash register. One of the men, who wore dark-colored shoes and a distinctive jacket, brandished a gun, pointing it repeatedly, and at close range, at the victim's head and body, while continuously shouting at him. The victim did not open the register and, despite several attempts, the robbers were unable to do so themselves. As the robbers left the store, the victim pursued them. The robber in the dark shoes and jacket then shot the victim in the head with a .22 caliber revolver. The robbers fled in a getaway car driven by a third person. The entire encounter in the store lasted just over one minute.

The store's owner provided the police with the surveillance tapes of the murder. In the course of their investigation, the police played the audio portions of the tapes to a witness, who, based on the sound of the voice as well as the atypical version of street slang used, identified the voice as the defendant's. The police interviewed the defendant, who initially denied being in Lowell the weekend of the murder. The police then played the audio portion of the surveillance tape for him. At first the defendant became upset and wept, but he denied that the recorded voice was his, and denied that he had any role in the matter. Later, when a detective said that the recorded voice sounded like the defendant's, he admitted involvement in the robbery. The defendant also admitted that he was then wearing the same dark colored shoes he had worn during the crime. The defendant attempted to minimize his culpability by identifying another man, whom he called "Spooky," as the shooter, and

claiming that he had lent "Spooky" his jacket.[2]

The police executed a warrant to search the defendant's house and found a green jacket that closely resembled the one worn by the shooter. Witnesses testified that the defendant was wearing the same green jacket shortly before and just after the murder. The police also found two spent .22 caliber bullet cartridges in the defendant's backpack.

Prior to trial, the defendant moved to suppress his statements during the police interview. The judge denied the motion, finding that the defendant's Miranda waiver and statements were made knowingly, voluntarily, intelligently, and without coercion, a finding that the defendant does not contest on appeal. The judge also ruled that playing the audiotape of the robbery and murder for the defendant "was not illegal or coercive." The defendant then filed a motion in limine to prevent the admission of the audiotaped statements at trial, claiming that it was made in violation of the Massachusetts wiretap statute. G. L. c. 272, § 99. He made no Federal claim. The judge denied the motion. Relying on *Commonwealth* v. *Santoro*, 406 Mass. 421 (1990), he concluded that suppression was not warranted because the store's surveillance audiotaping had been conducted by the store owner without any involvement by law enforcement officials.

Following his conviction, the defendant moved for a new trial. He claimed that his statements to the police should have been suppressed because they were obtained in violation of the Massachusetts wiretap statute and its Federal counterpart, 18 U.S.C. § 2510 (2). He also argued that trial counsel's failure to pursue the issue or to object to the admission in evidence of the audio recording constituted ineffective assistance of counsel. The motion judge, who had presided at the trial, denied the motion.

2. *The Massachusetts wiretap statute.* We turn first to the

---

[2]The police later learned that "Spooky" was the nickname of Favian Deaza. Deaza subsequently pleaded guilty to manslaughter, armed assault with intent to rob, and unlawful possession of a firearm. A third individual, Terri Simbalist, the driver of a getaway car, pleaded guilty to the same offenses. Before identifying the defendant the police already had located and interviewed Simbalist.

defendant's claims under the Massachusetts wiretap statute, G. L. c. 272, § 99. The defendant asserts that suppression of the audio portion of the videotape recording of the killing is mandated under the statute, first, because the recording was a secret interception of an oral communication in violation of G. L. c. 272, § 99 C 1,[3] and second, because its use by the police to identify the defendant and then to elicit a confession from him violated G. L. c. 272, § 99 C 3.[4] In this case we need not determine the predicate issue, whether the audiotape was made in violation of the wiretap statute, because under the principles of stare decisis, *Commonwealth* v. *Santoro*, 406 Mass. 421 (1990) (*Santoro*), governs the second issue and, as the judge recognized, compels the conclusion that the police officers' actions were not unlawful.[5]

In *Santoro*, this court confronted the question whether recordings of incriminating telephone conversations of a defendant

[3]General Laws c. 272, § 99 C 1, states in pertinent part: "Except as otherwise specifically provided in this section any person who — willfully commits an interception, attempts to commit an interception, or procures any other person to commit an interception or to attempt to commit an interception of any wire *or oral communication* shall be [punished] . . ." (emphasis added).

General Laws c. 272, § 99 B 2, defines "oral communication" as "speech, except such speech as is transmitted over the public air waves by radio or other similar device," and G. L. c. 272, § 99 B 4, defines "interception," in part, as "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication.

[4]General Laws c. 272, § 99 C 3, provides: "Except as otherwise specifically provided in this section any person who . . . willfully discloses or attempts to disclose to any person the contents of any wire or oral communication, knowing that the information was obtained through interception; or . . . willfully uses or attempts to use the contents of any wire or oral communication, knowing that the information was obtained through interception, shall be guilty of a misdemeanor punishable by imprisonment in a jail or a house of correction for not more than two years or by a fine of not more than five thousand dollars or both."

[5]The defendant directs our attention to the finding of the judge at the motion hearing that the defendant had no knowledge of the recording and that it was made without his knowledge or permission. In light of our conclusion that our analysis is governed by *Commonwealth* v. *Santoro*, 406 Mass. 421 (1990) (*Santoro*), the question of the defendant's knowledge of or consent to the audiotaping is not probative.

made by a third party without the defendant's knowledge or consent, and thereafter obtained by the police, should have been suppressed. This court concluded that where the police had no part in recording the telephone conversations, suppression was not required because it would serve no deterrent purpose. *Id.* at 423. *Santoro* recognizes that the Massachusetts wiretap statute is carefully nuanced and strikes a balance between the legitimate privacy interests of individuals in speech they wish to keep private and the need to equip law enforcement officials with the means to combat increasingly sophisticated organized criminal activities. *Id.* at 423-424. See *Commonwealth* v. *Gordon*, 422 Mass. 816, 833 (1996) ("It is apparent from the preamble [to the statute] that the legislative focus was on the protection of privacy rights and the deterrence of interference therewith by law enforcement officers' surreptitious eavesdropping as an investigative tool").[6] The statute delegates to the courts the task of striking the proper balance in each individual case. *Santoro*, *supra* at 423. See G. L. c. 272, § 99 P (suppression of evidence).

Here, following *Santoro*, two factors compel denial of the motion to suppress. First, the police had no part in making, inducing, soliciting, or otherwise encouraging or abetting the making of the surveillance tape. The tape, evidence of a grave crime, fell into their hands. See *Santoro*, *supra* at 423. See also *Commonwealth* v. *Brandwein*, 435 Mass. 623, 630-632 (2002), and cases cited ("Nothing in our law" prevents police from acting on confidential information disclosed to them); *Commonwealth* v. *Leone*, 386 Mass. 329, 333 (1982), and cases

---

[6]The preamble to the wiretap statute, G. L. c. 272, § 99 A, states that "the increasing activities of organized crime constitute a grave danger to the public welfare and safety," that "[n]ormal investigative procedures are not effective in the investigation of illegal acts committed by organized crime," and that "[t]herefore, law enforcement officials must be permitted to use modern methods of electronic surveillance, under strict judicial supervision, when investigating these organized criminal activities." The preamble then states: "The general court further finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore . . . [t]he use of such devices by law enforcement officials must be conducted under strict judicial supervision and should be limited to the investigation of organized crime."

cited ("Evidence discovered and seized by private parties is admissible without regard to the methods used, unless State officials have instigated or participated in the search"). Police and prosecutors generally may use information derived from communications that are unlawfully obtained and disclosed by private individuals, such as stolen letters, conversations overheard in private places, and breaches of confidential communications. "That a private party may have breached some obligation . . . in volunteering information to the police does not require the police to ignore that information." *Commonwealth* v. *Brandwein, supra* at 631. Absent an explicit statement from the Legislature to the contrary, we will not read the "use" provisions of the wiretap statute as forcing police and prosecutors to avert their eyes from information procured by private individuals, without any encouragement from the State.[7] *Id.* at 632-633, quoting *Coolidge* v. *New Hampshire,* 403 U.S. 443, 488 (1971) ("the 'target' of the exclusionary rule 'is official misconduct,' and the rule is not intended 'to discourage citizens from aiding to the utmost of their ability the apprehension of criminals' ").[8]

We reject the defendant's contention that, by "using" the rec-

---

[7]The defendant interprets the statute to mandate the suppression of all information garnered by means of any unlawful interception of oral communications by a private individual in violation of the wiretap statute, regardless whether the government was involved in the unlawful surveillance. If the defendant were correct, there would be no need to include a statutory provision giving a defendant the opportunity to file a motion to suppress in terms that permitted a judge to exercise discretion to allow or deny the motion. See *Santoro, supra* at 423. See also *Commonwealth* v. *Crowley,* 43 Mass. App. Ct. 919, 919 (1997) (Massachusetts wiretap statute "does not mandate that all unlawfully intercepted communications should be suppressed. It merely gives a defendant in a criminal case standing to seek suppression of evidence obtained in violation of § 99").

[8]The report of the commission responsible for drafting the Massachusetts wiretap statute, G. L. c. 272, § 99, lends strong support to the result we reach today, and to the *Santoro* decision. The commission stressed its intention to create a statutory framework that, while staying within the limits set by then recent United States Supreme Court cases requiring warrants for police wiretapping, generally would facilitate the use of constitutionally obtained wiretap evidence in prosecutions. Their report evidences no suggestion that the police be barred from using wiretap evidence where, as here, its creation did not give rise to constitutional difficulties. See, e.g., Report of the Special Commission on Electronic Eavesdropping, 1968 Senate Doc. No. 1132, at 5-6, 8 ("The statute proposed by the Commission has revised the Massachusetts

ording to identify the defendant as the shooter and "using" the recording to elicit an admission from the defendant, the police violated the Massachusetts wiretap statute. As *Santoro, supra* at 422-423, makes clear, whatever use the police made of the recording was subject to the suppression, not the prohibition, element of the statute. It defies reason and logic to suggest that the Commonwealth could use the audio recording to identify the defendant at trial, as *Santoro* clearly contemplates, but not use it to identify the defendant in the course of their investigation.[9]

Second, murder is not only a heinous crime against the victim, but also a grave offense to the body politic and hence of high public concern. The Massachusetts wiretap statute, in its regulation of private conduct, attempts both to ensure privacy and, by reducing the risk of wrongful interception, to make individuals secure in their right of free expression. While the law bars all clandestine audio recording by private individuals, it was not intended to penalize the State when individuals with evidence pertaining to an ongoing murder investigation voluntarily disclose what they know to law enforcement authorities. Cf. *Bartnicki* v. *Vopper*, 532 U.S. 514, 536, 539 (2001) (Breyer, J., concurring) (in attempting to invoke statute that sought to balance privacy and freedom of expression, speakers who made clandestinely recorded "threat of potential physical harm" failed to prevail, in part because they "had little or no legitimate interest in maintaining the privacy" of their remarks). Here, the

law to require strict compliance with the probable cause provisions of the Fourth Amendment [to the United States Constitution]").

[9] The defendant relies on *Commonwealth* v. *Hyde*, 434 Mass. 594 (2001) (*Hyde*). At issue in *Hyde* was whether the defendant could be found criminally liable under the Massachusetts wiretap statute for surreptitiously recording his conversation with a police officer performing his official duties. Citing the statute's comprehensive prohibition against clandestine audiotaping by private individuals, we held that the defendant could be prosecuted for violating the statute. *Id.* at 599-600. The *Hyde* decision specifically did not address the issue of suppression at a criminal trial. *Id.* at 601. Here we have not been asked to consider whether the entity responsible for the unlawful interception of the defendant's conversations may be prosecuted; that entity, whatever its identity, is not a party to these proceedings. Rather, we must decide whether the recording may be used in a police investigation and as evidence where the police had no responsibility for, prior knowledge of, or involvement in the existence of, any unlawful interception of speech. On this issue, *Hyde* does not provide guidance.

maker of the audio recording voluntarily chose to disclose the evidence of a murder to the police. It would be anomalous — and contrary to legislative intent — to allow a defendant to bar the police from using such evidence. Cf. *id.* at 540 (in cases involving threat of physical harm, "the speakers' legitimate privacy expectations are unusually low, and the public interest in defeating those expectations is unusually high").[10]

Finally, had the Legislature intended the suppression of audio evidence in the circumstances present here (the use by police of a recording not of their making in an ongoing murder investigation), it has had ample opportunity to amend the statute accordingly. Since the *Santoro* decision, the Legislature twice has amended the wiretap statute but has not disturbed the statutory construction we established in that case. See St. 1993, c. 423, § 3 (effective April 12, 1994) (amending exemption provisions of wiretap statute); St. 1998, c. 163, §§ 7, 8 (effective Oct. 1, 1998) (amending definitions and exemption provisions of wiretap statute). Subsequent to *Santoro*, the Legislature also has criminalized other specific violations of privacy without disturbing our holding. See, e.g., G. L. c. 272, § 104, inserted by St. 2004, c. 395, § 6 (effective Feb. 14, 2005) (criminalizing photographing, videotaping, or electronic surveillancing of partially nude or nude persons); G. L. c. 93, § 89 (prohibiting

---

[10]The legislative history of the Massachusetts wiretap statute makes clear that the Legislature did not intend to bar private individuals from aiding the police in a murder investigation. The report giving rise to the statute noted repeatedly that the commissioners were concerned with the protection of private "conversations," particularly by devices used to monitor telephone lines and by devices placed in private locations. See 1968 Senate Doc. No. 1132, at 6-7, 9; *id.* at 11 (concurring opinion of Commissioner Elliot B. Cole) (discussing use of wiretap statute to avoid "betrayal" of individual's "confidence in the person to whom he is talking"); Interim Report of the Special Commission on Electronic Eavesdropping, 1967 Senate Doc. No. 1198 (discussing types of eavesdropping devices commercially available). Here the defendant cannot reasonably claim that his recorded threats and obscenities were a "conversation." See, e.g., Webster's Third New Int'l Dictionary 498 (1993) (defining "conversation" as "oral exchange of sentiments, observations, opinions, ideas").

The defendant also can draw no support from the message of Governor John A. Volpe urging passage of a wiretap statute. The Governor wrote that "fighting crime" "is the joint responsibility of all of us" and "falls in large measure" on the people of this Commonwealth, who "must assist" the police. 1968 House Doc. 3797.

dressing room surveillance in retail establishments by means of "two-way mirror, electronic video camera, or similar device"). We long have recognized that the principle of stare decisis is particularly weighty where the Legislature has declined to exercise its authority to overturn the court's interpretation of a statute. "It is a well settled rule of statutory interpretation that, when a statute after having been construed by the courts is re-enacted without material change, the Legislature are presumed to have adopted the judicial construction put upon it. The doctrine of stare decisis is supported by legislative approval." *Nichols* v. *Vaughan*, 217 Mass. 548, 551 (1914). See *Doherty* v. *Commissioner of Ins.*, 328 Mass. 161, 164 (1951); *Rival's Case*, 8 Mass. App. Ct. 66, 69 (1979); 2B N.J. Singer, Sutherland Statutory Construction § 49.05, at 27-28 (6th ed. rev. 2000). The judge properly refused to suppress the evidence.

Because there was no error in the judge's denial of the motion to suppress, there can be no ineffective assistance of counsel. See *Commonwealth* v. *Stroyny*, 435 Mass. 635, 652 (2002).

3. *The Federal wiretap statute.* The Federal wiretap statute, 18 U.S.C. §§ 2510 et seq., requires that a party seeking to suppress a recording had a legitimate expectation of privacy when he made the recorded statements. 18 U.S.C. § 2510 (2) (defining "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation"). See *Commonwealth* v. *Look*, 379 Mass. 893, 909-910, cert. denied, 449 U.S. 827 (1980). See also *United States* v. *Peoples*, 250 F.3d 630, 636-637 (8th Cir. 2001), *S.C.*, 360 F.3d 892 (2004), cert. dismissed, 543 U.S. 1042 (2005) (statutory definition of "oral communication" requires that "the individuals involved must show that they had a reasonable expectation of privacy in that conversation"). In determining whether a defendant has made the requisite showing, courts apply the familiar standards of the Fourth Amendment to the United States Constitution. See *id.* at 637. Here, the judge correctly concluded that any expectation the defendant claimed of privacy in his statements objectively was unreasonable in the circumstances: he shouted threats and obscenities at a clerk in a

convenience store open to the public.[11] The defendant could not reasonably have expected such remarks — whether overheard by a customer, a passerby, a store employee, or a surveillance camera recording his words — to be confidential. See *Johnson* v. *Hawe*, 388 F.3d 676, 684 (9th Cir. 2004), cert. denied sub nom. *Sequim* v. *Johnson*, 544 U.S. 1048 (2005), quoting Op. Wash. Att'y Gen. No. 11 (1988) ("the participants in a conversation that can be readily overheard and recorded by the general public do not have a reasonable expectation of privacy in their conversation"). See also *Maryland* v. *Macon*, 472 U.S. 463, 469 (1985) (defendant had no "reasonable expectation of privacy in areas of [a retail] store where the public was invited to enter and to transact business"). Contrast *United States* v. *Gonzalez, Inc.*, 412 F.3d 1102, 1117 (9th Cir. 2005) (company executives had reasonable expectation of privacy in conversations inside small office of family-run business). The Federal statute provides no grounds for limiting the use of the recording by the Commonwealth.[12]

4. *Relief pursuant to G. L. c. 278, § 33E.* The defendant seeks reduction of the verdict to murder in the second degree, claiming that his conviction of murder in the first degree is "arguably arbitrary" and that the result is not "in accord" with "principles of fundamental fairness" because the jury rejected the theory of premeditated murder,[13] the evidence would have supported a verdict of murder in the second degree,[14] and

---

[11]The store was open to the public at the time of the murder. Only moments after the crime occurred, a customer walked into the store, saw the victim, and telephoned the police.

[12]Our disposition of the statutory claims of the defendant also disposes of his claim that he has a constitutionally based reasonable expectation of privacy (State and Federal) created by the existence of a statute criminalizing secret tape recordings.

[13]The defendant was charged with, and the jury were instructed on, murder in the first degree on a theory of deliberate premeditation. The defense was that the shooting was not premeditated and that the victim's death did not occur during the commission of the predicate felony, but only after that felony had terminated. The jury did not find the defendant guilty of premeditated murder.

[14]The predicate offense for murder in the first degree on a theory of felony-murder must be the commission or attempted commission of an offense punishable by death or life imprisonment. *Commonwealth* v. *Jackson*, 432

because the other two participants in the crime were convicted of lesser offenses. See note 2, *supra.*

The judge meticulously defined the elements of murder in the first and second degrees on theories of felony-murder. In his instructions, he carefully distinguished the charged offense, armed assault with intent to rob, and the unindicted predicate felony, attempted armed robbery while masked.[15] He carefully explained to the jury that, in order to convict the defendant of murder in the first degree on a felony-murder theory, the jury must find the defendant guilty of attempted armed robbery while masked. He then instructed that the jury could convict the defendant of murder in the second degree on a felony-murder theory if they found the defendant guilty of armed assault with intent to rob. The judge separated the two offenses and the instructions for felony-murder in the first degree and felony-murder in the second degree. He organized the charge in a clear and coherent manner. Our review of the record indicates that

Mass. 82, 89 (2000). See Model Jury Instruction on Homicide at 15-16 (1999). The defendant was convicted separately of armed assault with intent to rob, a crime that would, on a theory of felony-murder, support a conviction of murder in the second degree, but not murder in the first degree. A conviction of murder in the first degree on a theory of felony-murder does not require that the defendant separately be indicted on the predicate felony. See *Commonwealth* v. *Smiley,* 431 Mass. 477, 491 (2000), quoting *Commonwealth* v. *Eagles,* 419 Mass. 825, 839 n.16 (1995).

[15]The elements of attempted armed robbery while masked are the following: an attempt to take money or other property with intent to steal it from the victim (or from the victim's immediate control), while the defendant, armed with a dangerous weapon and masked or disguised, applies either actual force and violence to the body of the victim or, by threatening words or gestures, puts the victim in fear. See G. L. c. 265, § 17, and *Commonwealth* v. *Novicki,* 324 Mass. 461, 464-465 (1949). See also G. L. c. 274, § 6; *Commonwealth* v. *Ortiz,* 408 Mass. 463, 470-473 (1990). The elements of armed assault with intent to rob are that the defendant, armed with a dangerous weapon, assaults a person with a specific or actual intent to rob the person assaulted. See G. L. c. 265, § 18. An assault may be committed in either of two ways: by an attempted battery or an immediately threatened battery. Fear or apprehension by the victim is not an element of the first branch (attempted battery), see *Commonwealth* v. *Richards,* 363 Mass. 299, 303 (1973), and the judge here, after discussing the matter with counsel, instructed only on the first branch. Thus, the crime of attempted armed robbery while masked includes elements that armed assault with intent to rob does not: the former requires the masked element and the use of actual force or violence on the victim or fear or apprehension by the victim.

the jury were well warranted in finding beyond a doubt that the elements of felony-murder in the first degree based on the predicate felony of attempted armed robbery while masked (the attempted commission of a felony punishable by life imprisonment) had been proved, as the jury indicated in announcing their verdicts.[16]

The jury were required by law (and were so instructed) to return a verdict of the highest degree of murder that they found the Commonwealth had proved beyond a reasonable doubt. *Commonwealth* v. *Simpson*, 434 Mass. 570, 592-593 (2001). *Commonwealth* v. *Anderson*, 408 Mass. 803, 808 (1990), and cases cited. See *Commonwealth* v. *Noeun Sok*, 439 Mass. 428, 439-440 (2003), quoting *Commonwealth* v. *Dickerson*, 372 Mass. 783, 797 (1977) (finding no inconsistency between jury's "obligation to return a verdict of the highest degree of murder that the Commonwealth has prove[d] beyond a reasonable doubt" and statutory requirement that "[t]he degree of murder shall be found by the jury," stating that "[t]here is no doubt that the [former] instruction is correct"). Contrast *Commonwealth* v. *Paulding*, 438 Mass. 1, 10-11 (2002) (holding that defendant was not entitled to instruction on murder in second degree unless evidence would support such conviction, notwithstanding statutory requirement that jury shall determine degree of murder).

It is of no import in this case that two other perpetrators of the attempted robbery pleaded guilty to lesser offenses. See note 2, *supra*. The defendant, like his companions, attempted to rob a store clerk. But it was the defendant who, his face covered with a fearsome mask, repeatedly brandished a gun at the face and head of the victim, and screamed obscenities at the victim as he pushed him toward the cash register. It was the defendant who, after unsuccessful attempts to open a cash register, shot the unarmed victim in the head. On our review of the entire record pursuant to our obligation under G. L. c. 278, § 33E, we can discern no reason, argued by the defendant or otherwise, to reduce the verdict or to order a new trial.

5. *Duplicative conviction.* While the defendant has not raised

---

[16]The verdict slips, which we have reviewed, similarly confirm that the jury had found the defendant guilty of murder in the first degree, "felony murder."

the issue, the conviction of armed assault with intent to rob must be vacated as duplicative of the felony-murder conviction. When the jury return a guilty verdict on a theory of felony-murder, the predicate felony merges into the felony-murder conviction as a lesser included offense. *Commonwealth* v. *Mello*, 420 Mass. 375, 398 (1995). See *Commonwealth* v. *Wilson*, 381 Mass. 90, 123-125 (1980). Cf. *Commonwealth* v. *Brum*, 441 Mass. 199, 200 n.1 (2004) (predicate felony does not merge when jury convict on theory of extreme atrocity or cruelty). This is merely an application of the general rule that one cannot simultaneously be convicted of a crime and of its lesser included offense. See *Commonwealth* v. *Gunter*, 427 Mass. 259, 275 (1998) ("A defendant's protection against multiple punishments for the same offense bars conviction and sentencing on a lesser included offense"; noting that the "appropriate remedy" is to vacate both conviction and sentence on lesser offense); *Commonwealth* v. *Jones*, 382 Mass. 387, 395 (1981), and cases cited.

The facts here would not have supported separate convictions of armed assault with intent to rob and attempted armed robbery while masked. This is not a case in which the defendant committed two separate — and potentially predicate — felonies in the course of a killing. Cf. *Commonwealth* v. *Rasmusen*, 444 Mass. 657, 666-667 (2005). Rather, the jury were instructed on two theories of criminal responsibility — attempted armed robbery while masked and armed assault with intent to rob — "so closely related in fact as to constitute in substance but a single crime." *Commonwealth* v. *Thomas*, 401 Mass 109, 120 (1987), quoting *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 662-663 (1979). Accordingly, the armed assault with intent to rob conviction is duplicative of the predicate felony, and hence of the murder conviction. See *Commonwealth* v. *Gunter, supra* at 275-276. See also *Commonwealth* v. *Mello, supra* at 398; *Commonwealth* v. *Wilson, supra* at 124 (felony-murder conviction bars additional punishment based on the "same evidence").

*Conclusion.* The judgment of conviction of the armed assault with intent to rob and the sentence imposed are vacated. The defendant's convictions for murder and unlawful possession of

a firearm are affirmed, as is the order denying the defendant's motion for a new trial.

*So ordered.*

COWIN, J. (concurring in part). The court today does not rule on the central question presented by this case: whether the audio portion of a surveillance videotape recording that captured the killing of a convenience store clerk, made by three standard security surveillance cameras mounted by the store owner in plain view, was made in violation of the Massachusetts wiretap statute, G. L. c. 272, § 99. Instead, the court holds that, regardless whether the recording was made by the store owner in violation of the statute, because "the police had no part in making, inducing, soliciting, or otherwise encouraging or abetting the making of the surveillance tape," it should not be suppressed. *Ante* at 124. Because I would expressly hold that the audio recording in this case violates neither the Massachusetts wiretap statute, G. L. c. 272, § 99, nor its Federal counterpart, 18 U.S.C. §§ 2510 et seq., and was thus properly admitted in evidence by the trial judge, I concur in so much of today's opinion as affirms two of the defendant's convictions. However, I disagree strongly with the contention that, where an illegal recording was exploited but not made by the police, judicial discretion rather than the plain statutory language ought to control whether that evidence is to be suppressed under § 99 P. I first discuss an alternate basis for affirming two of the defendant's convictions, and then discuss my disagreement with the court's holding that wiretap evidence illegally obtained by a private individual should not be suppressed.

1. *Recording lawful under Massachusetts wiretap statute.* General Laws c. 272, § 99 C 1, states in pertinent part:

> "Except as otherwise specifically provided in this section any person who . . . *willfully* commits an *interception*, attempts to commit an interception, or procures any other person to commit an interception or to attempt to commit an interception of any wire or oral communication shall be [punished] . . ." (emphasis added).

The term "interception" is defined as "to *secretly* hear, *secretly* record, or aid another to *secretly* hear or *secretly* record the contents of any wire or oral communication" (emphasis added). G. L. c. 272, § 99 B 4. The statute also provides in § 99 C 3 a and b that it is unlawful to "willfully disclose[]" or "willfully use[]" the contents of any wire or oral communication known to have been obtained by interception.

The defendant claims that the audio portion of the tape recording of the killing was a secret interception of an oral communication in violation of § 99 C 1, and that the police improperly used the illegally intercepted oral communication as a tool to identify the defendant and then to elicit a confession from him in violation of § 99 C 3. I would conclude that the making of the audiotape was not an unlawful "interception" under the wiretap statute and thus the police "use[]" and "disclos[ure]" of the recording was not proscribed by the statute. The routine store surveillance that occurred here, regardless of its audio component, was not the type of "secret" or surreptitious eavesdropping that the Legislature expressly prohibited by the statute. See G. L. c. 272, § 99 B 4 (illegal "interception" defined as "secret[]" recording). The audio recording devices were part of video cameras within plain view of any person entering the store, including the defendant. The defendant can be presumed to have had actual awareness of the existence of the devices and that he was under surveillance. That the defendant did not know the camera also included an audio component does not convert this otherwise open recording into the type of "secret" interception prohibited by the Massachusetts wiretap statute. See *Commonwealth* v. *Jackson*, 370 Mass. 502, 507 (1976) (for recording to fall outside definition of "interception," defendant need not be informed his conversation is being recorded; we may imply "actual knowledge" from "clear and unequivocal objective manifestations of knowledge").

Even assuming, arguendo, that a literal reading of the statute would render unlawful the audiotaping of the type that occurred in the instant case, I am loath to attribute to the Legislature the intention that such recordings be prohibited in the absence of more specific language to that effect and in light of the statute's

purposes. In *Commonwealth* v. *Gordon,* 422 Mass. 816, 832-833 (1996), where we held that a police recording (video and audio) of the defendants' booking procedure was not a violation of the wiretap statute, we emphasized that "the legislative focus [of the wiretap statute] was on the protection of privacy rights and the deterrence of interference therewith by law enforcement officers' surreptitious eavesdropping as an investigative tool." *Id.* at 833. Although we concluded that the statute, read literally, could make unlawful the audiotaping of booking procedures without the knowledge of arrestees, "in the absence of more specific statutory language to that effect and in light of the preamble, we [were] unwilling to attribute that intention to the Legislature." *Id.* at 832-833.

In this case, just as in the *Gordon* case, it is difficult to see how the proscription of such a recording would further either of the statute's primary purposes: that "law enforcement officials must be permitted to use modern methods of electronic surveillance, *under strict judicial supervision*" and that "uncontrolled development and unrestricted use of modern electronic surveillance devises pose grave dangers to the privacy of all citizens of the commonwealth" (emphasis added). G. L. c. 272, § 99 A (preamble). See *Commonwealth* v. *Gordon, supra* at 833. See also *ante* at 124. As the court rightly acknowledges, the recording at issue in the instant case implicates no compelling privacy rights. See *ante* at 126-127. The event that was captured here was not secret: it was an attempted robbery and murder by a masked defendant who presumably knew he was being monitored. The recording was not intended to "capture or reveal the defendant['s] thoughts or knowledge about some fact or subject," *Commonwealth* v. *Gordon, supra* at 833, and it was not "clandestine" eavesdropping. Contrast *Commonwealth* v. *Hyde,* 434 Mass. 594, 599-600 (2001). Nor would the prohibition of such a privately made recording have any bearing on deterring police officials from using surreptitious eavesdropping as an investigative tool absent judicial supervision. See *Commonwealth* v. *Gordon, supra.* Accord *ante* at 124-125. The cameras here were installed not by police officials in the absence of the proper authority, but by a private party for security purposes. I am not inclined to construe a statute enacted to

protect the public from one form of lawlessness in a manner that will deter reasonable efforts to prevent other forms. I am thus satisfied that the Legislature did not intend to preclude this type of public recording designed to protect employees and customers of a retail establishment.[1]

2. *Suppression analysis under § 99 P.* Unfortunately, rather than addressing the question directly presented by this case, the court looks (unnecessarily, in my opinion) to the theory behind the suppression of evidence, and eviscerates the suppression provision of the Massachusetts wiretap statute, G. L. c. 272, § 99 P, to reach its conclusion. The court relies on *Commonwealth* v. *Santoro*, 406 Mass. 421, 423 (1990) (*Santoro*), for the proposition that even though a private audio recording may violate the Massachusetts wiretap statute, the exclusionary rule should not preclude its admission where "no police or governmental conduct was involved in the recording" of the conversation. I would reject this confused precedent in favor of a more logical approach that adheres to the statute's express language and vindicates its protective purpose: where an audio recording is obtained in violation of the wiretap statute,[2] barring some statutorily conferred exception, that evidence should be suppressed.

In *Santoro*, this court held that it is not illegal for the police to exploit the contents of secretly recorded telephone conversa-

---

[1]At first blush, it appears my analysis differs little from that of the court. Like the court, I look to the purposes articulated in the statute's preamble, including any deterrent purpose admission of the evidence might have, see *ante* at 124-125, as well as the fact that the audio portion of the videotape lacked any "private" quality. See *ante* at 127 n.10. Indeed, I agree with the court that these factors are relevant to the analysis. However, I consider these factors as bearing only on whether the surveillance recording in the instant case actually violated the Massachusetts wiretap statute. Unlike the court, I do not think these considerations have any effect on the question whether recordings *held to have been made in violation* of the statute should nonetheless be admitted in evidence. Once a violation of the wiretap statute has been established, nothing apart from the statute's own exceptions should condone the use of such a recording by the police. See discussion *infra*.

[2]Because the court bases its opinion on a hypothetical situation in which any recordings "willfully use[d]" or "willfully disclose[d]" by the police were also made in violation of the statute, I make the same assumption. As I explain above, however, the recording implicated in the instant case was not a secret interception made in violation of the wiretap statute.

tions, provided the police played no role in recording them. I believe that opinion was wrongly decided and should be overruled.[3] In reading into the statute a blanket exemption for police officers to reap the benefits of violations of our wiretap statute by private citizens, the *Santoro* opinion (without citation) points to the general proposition that exclusionary rules are "intended to deter future police conduct in violation of constitutional or statutory rights." *Id.* at 423. The *Santoro* court reasoned, "No deterrent purpose would be served by suppressing . . . intercepted conversations" made by "[a] private individual, apparently engaged in unlawful activity himself," where "no police or governmental conduct was involved" in the interception. *Id.* Finally, and again without support, the *Santoro* court states, "The exclusionary rule was not designed to protect persons from the consequences of the unlawful seizure of evidence by their associates in crime." *Id.* This misses the point. Our exclusionary rule need not do the work of prohibiting the introduction of illegally obtained wiretap evidence at trial where the wiretap statute would expressly do so itself. Cf. *United States* v. *Vest,* 813 F.2d 477, 481 (1st Cir. 1987) ("the fourth amendment exclusionary rule is a judicially-fashioned rule serving different purposes than the congressionally-created [suppression rule under the Federal wiretap statute] — a rule that we are here limited to interpreting rather than modifying").

The court's adherence to *Santoro's* striking conclusion that the police must be responsible for the illegal recording in order for that recording to be suppressed ignores the clear statutory language barring the wilful use and disclosure of illegally intercepted communications and the narrowly defined exceptions to that rule. Where the police "willfully use[]" or "willfully disclose[]" the contents of a secretly recorded communication made in violation of the statute to identify a defendant, obtain a confession, or ultimately prove guilt at trial, even where police officers played no role in the initial recording,

---

[3]While stare decisis is certainly an important bulwark of our legal system, it is no excuse to perpetuate judicial error. "*Stare decisis* is not an inexorable command; rather, it 'is a principle of policy and not a mechanical formula of adherence to the latest decision.'" See *Hancock* v. *Commissioner of Educ.,* 443 Mass. 428, 471 (2005) (Cowin, J., concurring), quoting *Payne* v. *Tennessee,* 501 U.S. 808, 828 (1991).

they are acting in contravention of the plain language of the statute. See G. L. c. 272, § 99 C 3. The statute sets forth limited exceptions under which police may "disclose" or "use" "intercepted" communications. See G. L. c. 272, § 99 D 2 a, b ("Any investigative or law enforcement officer, who, by *any means authorized by this section*, has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose [or use] such contents or evidence in the proper performance of his official duties").[4] Significantly, the "clean hands" scenario espoused by *Santoro* and the court today does not fall within these express exceptions. Nor do any of the exceptions permit the interception of communications which "aid[] the police in a murder investigation." *Ante* at 127 n.10.[5] A communication known to be recorded in violation of the statute, whether that violation was carried out by a private individual or a public official, *ante* at 124-125, and regardless how "heinous" the crime captured by such a communication, *ante* at 126, cannot be said to be authorized by the statute within the meaning of the exceptions. *Id.* See *Commonwealth* v. *Hyde*, 434 Mass. 594, 602 n.9 (2001) ("Although we have stated that . . . electronic recording by the police . . .

---

[4]The statute contains several other limited exceptions applicable to police officers, none of which would justify the use or disclosure of illegally obtained communications. See G. L. c. 272, § 99 B 4 ("it shall not constitute an interception for an investigative or law enforcement officer . . . to record or transmit a wire or oral communication if the officer is a party to such communication or has been given prior authorization"); § 99 D 1 c (no violation for "officers of the United States of America to violate the provisions of this section if acting pursuant to authority of the laws of the United States"); § 99 D 1 d (no violation "for any person duly authorized to make specified interceptions by a warrant issued pursuant to this section"); § 99 D 1 e (no violation "for investigative or law enforcement officers to violate the provisions of this section for the purposes of ensuring the safety of any law enforcement officer or agent thereof").

[5]The court justifies these judicially made exceptions in part on the absence of any "explicit statement from the Legislature" that "the 'use' provisions of the wiretap statute [were intended to] forc[e] police and prosecutors to avert their eyes from information procured by private individuals, without any encouragement from the State." *Ante* at 125. This rationale is tautological and turns the usual rules of statutory construction on their head: the court first divines an exception where none is indicated in the statute's text, then attempts to legitimize its judicial overreaching by pointing to the absence of any language expressly contradicting its exception.

is a good practice . . . by no stretch of the imagination did we suggest that it is desirable for citizens to intercept or record electronically the speech of others"). In the face of an exclusive list of narrowly drawn exceptions to the statute's use and disclosure prohibitions, and consistent with the over-all protective purpose of the statute, it seems unlikely that the Legislature inadvertently neglected to mention an intended policy exception, based on deterrence, the seriousness of the crime to be solved by the evidence, or any other principle, that is applicable to all evidence illegally recorded by private citizens but exploited by the police. The Legislature, not this court, should be given the final say on when and whether the police may exploit secret interceptions.

Additionally, the *Santoro* court and the court today misread the statute's suppression provision. In abundantly straightforward terms, the statute provides that evidence of a wire or oral communication that was illegally obtained, regardless of who illegally obtained it, may be suppressed. Section 99 P, which governs suppression, reads:

> "*Any* person who is a defendant in a criminal trial . . . may move to suppress the contents of *any* intercepted wire or oral communication or evidence derived therefrom, for the following reasons: 1. That the communication was *unlawfully intercepted.* 2. That the communication was *not intercepted in accordance with the terms of this section* . . . . 5. That the evidence sought to be introduced was *illegally obtained.*" (Emphases added.)

This provision offers weak support at best for *Santoro's* conclusion that the Legislature left "it to the courts to decide whether unlawfully intercepted communications must be suppressed." *Id.* at 423. While the statute employs the phrase "may move to suppress," I do not find in this language evidence of any intended *judicial* discretion. See *id.*; *ante* at 124. A logical reading of the suppression provision is that it sets forth the standard procedure by which a *defendant,* in his or her judgment, may choose to seek suppression of evidence. The judge must then determine whether an illegality has taken place within the meaning of the statute; if so, the statute requires that the evidence be suppressed. Section 99 P refers neither to deterrence (referred to

in *Santoro*) nor case-by-case balancing of individual privacy interests and law enforcement needs (endorsed by the court today). It is illogical to assume that the Legislature, having broadly protected the citizens of the Commonwealth against secret recordings, would leave the decision regarding use of the products of unlawful interceptions to ad hoc determination by judges.

In my view, the balancing of relevant social interests has been carried out by the Legislature in drafting the statute; it is not the province of judges to "rebalance" under the cloak of the exclusionary rule. The question relevant to the suppression of illegally obtained wiretap evidence is not whether our exclusionary rule would forbid the admission of the recording, but instead whether the wiretap statute itself would forbid it. The exclusionary rule is a judicially created rule of evidence, designed to deter unconstitutional police conduct. It does not limit separate legislative efforts to augment protections against the use of illegally obtained evidence at trial.[6]

Unlike the court today, I would adhere to the approach taken by a majority of the Circuit Courts of the United States Court of Appeals in declining to impose a "clean hands" exception to the suppression provision of the closely analogous Federal

---

[6]The court points to the fact that "[p]olice and prosecutors generally may use information derived from communications that are unlawfully obtained and disclosed by private individuals, such as stolen letters, conversations overheard in private places, and breaches of confidential communications." *Ante* at 125. As noted above, the court confuses the issue of suppression under the wiretap statute, which is expressly provided for in § 99 P, with the common-law suppression of evidence in instances where there is no express statutory provision requiring the suppression of the illegally obtained evidence. Contrast *Commonwealth* v. *Brandwein*, 435 Mass. 623, 630, 631 (2002) (no suppression required where psychotherapist revealed contents of therapy session to officer in contravention of "professional ethics" and where "[n]othing in our law prevented [the officer] from acting on that information"). The cases of *Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971), and *Commonwealth* v. *Leone*, 386 Mass. 329 (1982), on which the court also relies, are inapposite. Those cases involve the issue whether invasions of privacy by private individuals in the absence of State action warrant suppression under the Fourth Amendment to the United States Constitution. See *Coolidge* v. *New Hampshire, supra* at 488-489; *Commonwealth* v. *Leone, supra* at 336. However, unlike the Fourth Amendment, the Massachusetts wiretap statute was directed at both private and public conduct and contains no State action requirement. See, e.g., G. L. c. 272, § 99 C 1 (illegal for "*any* person" to commit interception).

wiretap statute. See 18 U.S.C. § 2515. We have recently taken a similar position. See *Commonwealth* v. *Damiano*, 444 Mass. 444, 449-450 (2005) (agreeing with majority of courts that "government involvement in the unlawful interception of a wire or oral communication is not required to trigger [the Federal wiretap statute's] exclusionary rule"); *Berry* v. *Funk*, 146 F.3d 1003, 1011-1013 (D.C. Cir. 1998) (law enforcement officers not entitled to use and disclose contents of illegally intercepted conversations even where they "neither participated in nor sponsored the interception"); *Chandler* v. *United States Army*, 125 F.3d 1296, 1302 (9th Cir. 1997) (same); *In re Grand Jury*, 111 F.3d 1066, 1077-1079 (3d Cir. 1997) (rejecting "clean hands" exception to Federal wiretap statute because "it is incomprehensible that Congress intended the admissibility of unlawfully intercepted communications to turn solely on whether the government participated in the interceptions"); *United States* v. *Vest*, 813 F.2d 477, 481 (1st Cir. 1987) ("declin-[ing] to read into [the Federal wiretap statute] an exception permitting the introduction in evidence of an illegally-intercepted communication by an innocent [government] recipient thereof").

The survival of *Santoro* is of no moment today for we are agreed, though we arrive there by different paths, that two of the convictions are affirmed. It is cause for concern, however, that the court clings to a decision that so plainly does violence to the clear words of a statute. Particularly in the defining of what evidence is, and is not, to be admitted in the courts of the Commonwealth, the Legislature's decision, subject only to constitutional considerations, is paramount. The court does nothing to advance either the specific purposes of the wiretap statute or the purposes of law enforcement in general by pretending otherwise.

CORDY, J. (concurring, with whom Greaney and Ireland, JJ., join). I concur in the judgment of the court and all of its conclusions, including its conclusion that where the police played no role in making the recording at issue, they have not violated the Massachusetts wiretap statute and suppression at trial is not

required by G. L. c. 272, § 99 P. *Commonwealth* v. *Santoro*, 406 Mass. 421 (1990). I write separately only to express my view on an issue not decided by the court, but addressed in the concurring opinion of Justice Cowin. I share her view that the use of visible surveillance cameras in convenience stores (with both audio and video capabilities) for the purpose of protecting their patrons and employees was never intended to be prohibited by G. L. c. 272, § 99. Nor does the language of the statute require such a result. There is no "interception" under the statute unless there is a "secret[] record[ing]." G. L. c. 272, § 99 B 4. Just because a robber with a gun may not realize that the surveillance camera pointed directly at him is recording both his image and his voice does not, in my view, make the recording a "secret" one within the meaning and intent of the statute. I understand that the record in this case may not be as complete as it might otherwise be, and that the court need not address this issue to resolve the limited suppression issue presented here. I would, however, affirm the trial judge's denial of the defendant's motion to suppress on both grounds.